1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION

11   LOCAL 66, et al.,

12                          Plaintiffs,

        v.
13

NORTHSHORE EXTERIORS INC.,
14

15                          Defendant.

CASE NO. C19-1261JLR

ORDER GRANTING
PLAINTIFFS' MOTION TO
CONFIRM PLAN DIRECTIVE
AND DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT

16

## I.   INTRODUCTION

17
        Before the court are two motions:  (1) Plaintiffs International Association of Sheet

18   Metal, Air, Rail, and Transportation Workers ("SMART") and Sheet Metal Workers

19   International Association Local 66's ("Local 66") (collectively, "Plaintiffs") motion to

20   confirm the Directive of the Plan Administrator of the Plan for the Settlement of

21   Jurisdictional Disputes in the Construction Industry (the "Directive") (MTC (Dkt. # 37));

22   and (2) Defendant Northshore Exteriors, Inc.'s ("Northshore") motion for summary

ORDER - 1

1   judgment (MSJ (Dkt. # 34)).  Each opposes the other's motion.  (MTC Resp. (Dkt. # 40);

2   MSJ Resp. (Dkt. # 42); MTC Reply (Dkt. # 43); MSJ Reply (Dkt. # 44).)  The court has

3   considered the parties' submissions, the relevant portions of the record, and the

4   applicable law.  The court also heard oral argument from the parties on December 22,

5   2020.  (Min. Entry (Dkt. # 48).)  Being fully advised, the court GRANTS Plaintiffs'

6   motion and DENIES Northshore's motion.

## II.   BACKGROUND

8        This case concerns confirmation of a directive involving Northshore's assignment

9   of construction work on a Central Puget Sound Transit Authority ("Sound Transit")

10  project.  The court reviews first the factual background of this case and then its

11  procedural history.

12  **A.   Factual Background**

13       Local 66 and Northshore are involved in the E-130 East Link Extension, Bellevue

14  to Seattle Project (the "E-130 Project") to extend the Puget Sound light rail system from

15  Seattle to Bellevue.  (Am. Pet. (Dkt. # 32) ¶ 7; 10/28/19 Hem Decl. (Dkt. # 21-1) ¶¶ 3-4;

16  10/3/19 Meyer Decl. (Dkt. # 14) ¶ 2.)  To work on the project, both entities agreed to be

17  bound by a project-labor agreement called the Sound Transit Project Labor Agreement

18  for the Construction of Sounder Commuter and Link Light Rail Projects (the "PLA").

19  (10/28/19 Hem Decl. ¶¶ 4-5; 11/2/20 Elbert Decl. (Dkt. # 36) ¶ 3.)

20       Northshore installs metal siding products and was awarded the metal roofing and

21  trim work for the E-130 Project.  (10/3/19 Meyer Decl. ¶ 2.)  Northshore initially

22  assigned the installation of metal roofing (the "Work") to the United Brotherhood of

1    Carpenters ("the Carpenters").  (*Id.* ¶ 4, Ex. 1.)  Local 66 challenged this assignment on

2    the basis that the Work was within its jurisdiction and, as such, should have been

3    assigned to Local 66.  (10/28/19 Hem Decl. ¶ 6.)  Pursuant to the PLA, a dispute over

4    who would perform work—known as a jurisdictional dispute—is governed by the Plan

5    for the Settlement of Jurisdictional Disputes in the Construction Industry (the "Plan").

6    (*Id.* ¶ 7, Ex. 5 ("Plan"); 10/3/19 Meyer Decl. ¶ 5.)

7            In accordance with the Plan, after initial attempts at resolution failed, Local 66,

8    through its parent union SMART, submitted a formal request on June 27, 2019, to

9    arbitrate this jurisdictional dispute.  (10/28/19 Hem Decl. ¶ 7, Ex. 4; 10/3/19 Meyer Decl.

10   ¶ 6, Ex. 2.)  On July 18, 2019, SMART and the Carpenters settled the jurisdictional

11   dispute and agreed the Work should be assigned to Local 66.  (10/28/19 Hem Decl. ¶ 10,

12   Ex. 7.)  The settlement stated that the Carpenters no longer "claim[] the [Work]" and

13   "ha[ve] asked SMART to reach out to the contractor in order to make arrangements to

14   man the project with SMART members."  (*Id.* at 2.)  The Carpenters agreed to "withdraw

15   their members from the work as soon as SMART members are dispatched."  (*Id.*)

16           On July 19, 2019, the Plan Administrator, after receiving the settlement, issued the

17   Directive assigning the Work to Local 66.  (10/3/19 Meyer Decl. ¶ 7, Ex. 4 ("Directive")

18   at 74-75.[1])  The Directive states that Northshore "is hereby directed to assign [the Work]

19   in according with the attached [settlement agreement]," which "must be complied with

20   . . . unless [Northshore] notifies the Administrator, within 24 hours of receipt of this

21

22           [1] Because the exhibit is not paginated (*see* Directive), the court cites to the page numbers
     supplied by its electronic docketing system.

1   directive, that it . . . requests that the jurisdictional dispute be processed through

2   arbitration to a decision." (*Id.* at 74.)  It is undisputed that Northshore, despite initial

3   concerns, did not request continued arbitration and instead communicated its intention to

4   assign the Work "to [Local 66] consistent with the terms of the . . . PLA." (MSJ at 11;

5   MSJ Resp. at 3; 10/3/19 Meyer Decl. ¶ 8, Ex. 5.)

6          As of July 19, 2019, Northshore had nine employees (the "Northshore

7   Employees") working on the E-130 Project.  (11/23/20 Hem Decl. (Dkt. # 42-2) ¶ 3, Ex.

8   1 ("Gaba Award") at 24.[2])  Certified payroll records show that after July 19, 2019,

9   Northshore began labeling the Northshore Employees as "sheet metal workers" and

10  continued to have them perform the Work.  (11/1/19 Elbert Decl. (Dkt. # 24) ¶¶ 7-8, Exs.

11  9-10.)  However, nothing in the record suggests that Northshore did anything further to

12  reclassify those employees as sheet metal workers.  (Gaba Award at 24.)

13         On July 24, 2019, Local 66 demanded that Northshore comply with the Directive

14  by requesting sheet metal workers from the Local 66 hiring hall.  (10/28/19 Hem Decl.

15  ¶ 14.)  The same day, Local 66 filed a second grievance against Northshore, alleging that

16  Northshore had violated the PLA's hiring procedures.  (*Id.* ¶ 17, Ex. 11.)  On July 29,

17  2019, Northshore responded in a letter that it still "intend[ed] to abide by" the Directive

18  and would "pay[] into the applicable trust funds" for benefits purposes[3] but that it "is not

19

20         [2] Northshore separately submitted the same document.  (*See* 11/2/20 Hilgenfeld Decl.
    (Dkt. # 35) ¶¶ 1-2, Ex. 1.)  The court refers to the document generally as "Gaba Award."

21         [3] Sound Transit does not allow contractors to pay cash in lieu of benefits on PLA
    projects.  Instead, contractors must pay into a union trust fund on behalf of all their covered
22  employees.  (*See* 11/23/20 McCracken Decl. (Dkt. # 42-1) ¶ 5, Ex. 4 at 3.)

ORDER - 4

1    required to dispatch workers from the . . . Local 66 hiring hall." (*Id.* ¶ 15, Ex. 10;

2    10/3/19 Meyer Decl. ¶ 9, Ex. 6.)  Northshore explained that the hiring procedures

3    outlined in the PLA do not apply because of its collective bargaining agreement with the

4    Carpenters.  (*Id.*)

5         At some point in August 2019, while Local 66's second grievance was pending,

6    Northshore attempted to make the benefits contributions it previously mentioned.  (*See*

7    Gaba Award at 28.)  Local 66 refused to accept these contributions due to the ongoing

8    dispatch dispute, prompting Northshore to file a grievance.  (*Id.* at 28-29; *see also*

9    11/30/20 McCracken Decl. (Dkt. # 43-1) ¶ 3, Ex. 1 ("Arbitration Transcript") at

10   134:2-13.)  Purely to resolve the benefits contribution issue, the parties agreed to have the

11   Northshore Employees fill out the necessary paperwork with Local 66 so that they could

12   be dispatched and their benefit contributions could be processed back through the date

13   that the Directive was issued.  (Gaba Award at 30-31; Arbitration Transcript at

14   133:18-24.)  Local 66 maintained that this resolution was "dispatching the incorrect

15   workers," and both parties agreed that this resolution had no bearing on the dispatch

16   dispute.  (Gaba Award at 30.)  Subsequently, the Northshore Employees filled out the

17   necessary paperwork on August 28, 2019, and elected to be "financial core" members.[4]

18   (*Id.* at 31; 11/1/19 Elbert Decl. ¶ 9, Ex. 11.)

19

20        [4] "Financial core" members are those who have paid dues but are not subject to union
     discipline and do not enjoy the rights of full-fledged members.  *See NLRB v. General Motors
21   Corp.*, 373 U.S. 734, 737, 742-43 (1963).  This status originated in discussions over when
     employment may be conditioned upon membership to a union and in turn, the definition of such
22   membership.  *See id.* at 740-44.  Although the court uses the term "financial core" members, it
     expresses no opinion on whether that constitutes membership for the purpose of the Directive.

1      Arbitrator David Gaba heard Local 66's second grievance over the dispatch issue

2  on November 18, 2019, and he issued a decision on February 3, 2020.  (*See* Gaba Award

3  at 1-2.)  Arbitrator Gaba found that Northshore had violated the PLA's hiring procedures:

4          Although [Northshore's] certified payroll records noted that the nine (9)
        Northshore Employees were "sheet metal workers," simply calling them
5        sheet metal workers does not mean that they were actually working in that
        classification.  Furthermore, the record reflects that the only reason the
6        Northshore Employees were eventually dispatched through [Local 66's]
        dispatch procedures was to provide a mechanism for [Northshore] to pay the
7        [benefit] contributions on the Northshore Employees' behalf.

8  (*Id.* at 40.)  Arbitrator Gaba awarded back pay to Local 66 members through the date the

9  Northshore Employees became "financial core" members.  (*Id.* at 45.)

10      In addition to the above grievances, Northshore and Local 66 are and have been

11  engaged in many other arbitration disputes.  Arbitrator Michael E. Cavanaugh issued a

12  decision on the scope of an assignment award as it related to another project to extend the

13  light rail system, the E-335 Project.  (11/30/20 McCracken Decl. ¶ 2.)  Arbitrator Richard

14  Ahearn also issued an opinion regarding Local 66's grievance concerning metal siding

15  work on the N-150 Project—yet another project the parties are involved in.  (11/23/20

16  Hilgenfeld Decl. (Dkt. # 41) ¶ 2, Ex. 1.)  Pending before Arbitrator Luella E. Nelson is a

17  similar grievance brought by Local 66 regarding the E-320 Project.  (11/30/20

18  McCracken Decl. ¶ 2.)  Northshore has a pending grievance before Arbitrator Timothy

19  Williams over whether it can utilize its own employees on several jobs, including the

20  E-130 project.  (*Id.*; Arbitration Transcript at 17:9-14; 34:17-25.)

21      Northshore also filed an unfair labor practice charge against Local 66 with the

22  National Labor Relations Board ("NLRB") arguing that Local 66's dispatch practices

1   constitute illegal discrimination, including against one of the Northshore Employees on

2   the E-130 Project.  (11/23/20 McCracken Decl. ¶ 3, Ex. 2.)  The NLRB dismissed the

3   charge, noting in its August 3, 2020, decision that "the disputes underlying the instant

4   charge date back to about December 2018 and/or early 2019."  (*Id.* ¶ 4, Ex. 3 ("NLRB

5   Decision") at 1.)  The NLRB additionally observed that Northshore "has consistently

6   opposed removing its carpenter employees . . . and adhering to [Local 66's] hiring hall

7   procedures" and that Local 66 has "continue[d] contesting [Northshore's] assignment of

8   its carpenter employees to perform sheet metal work on the disputed projects."  (*Id.* at 2.)

9   Northshore has appealed this ruling.  (11/23/20 McCracken Decl. ¶ 4; MSJ Reply at 9.)

10          As confirmed during oral argument, there is no dispute that the same Northshore

11   Employees completing the Work on the E-130 project before the Directive continued to

12   do so after July 19, 2019.  (*See* MSJ at 7 ("The assignment of work did not mean,

13   however, that Northshore would terminate all of its employees on the project and hire

14   only [Local 66] members through the union hiring hall.").)  There is further no dispute

15   that those Northshore Employees signed up to be "financial core" members of Local 66

16   over a month after the Directive issued so that their benefits contributions could be

17   processed.  (11/1/19 Elbert Decl. ¶ 9; Gaba Award at 40; Arbitration Transcript at

18   133:18-24.)  And lastly, the parties agree that Northshore did not ask Local 66 to dispatch

19   workers off of its out-of-work list for the E-130 project until after Arbitrator Gaba's

20   award in February of 2020.  (*See* Gaba Award at 23.)

21   //

22   //

ORDER - 7

**B.    Procedural Background**

Plaintiffs filed a petition to confirm and enforce the Directive on August 9, 2019. (Pet. (Dkt. # 4) at 1.)  Northshore moved to dismiss Plaintiffs' petition for a lack of subject matter jurisdiction.  (MTD (Dkt. # 13).)  Northshore made similar arguments in that motion as it does here:  that there is no case or controversy as is required under Article III of the U.S. Constitution because it has complied with the Directive.  (*Id.* at 6.)

The court disagreed with Northshore and denied the motion to dismiss.  (Order on MTD (Dkt. # 31) at 2.)  The court rejected Northshore's facial and factual challenges to subject matter jurisdiction, noting that Plaintiffs not only alleged Northshore's non-compliance in its petition but also submitted evidence of that non-compliance.  (*Id.* at 6-7.)  The court recognized that Northshore submitted its own evidence of compliance but noted that "a motion to dismiss for lack of subject matter jurisdiction is not the appropriate vehicle for the court to resolve factual disputes."  (*Id.* at 9.)  Northshore moved for summary judgment on November 2, 2020, and Plaintiffs moved to confirm the Directive the next day.  (*See* MSJ; MTC.)

## III.    ANALYSIS

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no genuine issue of material fact and that it is entitled to prevail as a matter of

1    law.  *Celotex*, 477 U.S. at 323.  If that burden is met, the nonmoving party "must make a

2    showing sufficient to establish a genuine dispute of material fact regarding the existence

3    of the essential elements" of her case.  *Galen*, 477 F.3d at 658.

4        The purpose of summary judgment is to pierce the pleadings and to assess the

5    evidence to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus.*

6    *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In resolving a summary judgment

7    motion, the court credits the evidence of the opposing party, *Anderson v. Liberty Lobby,*

8    *Inc.*, 477 U.S. 242, 255 (1985), and draws all reasonable inferences that may be drawn

9    from the facts placed before the court in the opposing party's favor, *Matsushita*, 475 U.S.

10   at 587.  However, the court may not weigh evidence or make credibility determinations

11   because those are "jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.

12       Here, Plaintiffs ask the court to confirm the Directive under § 301 of the

13   Labor-Management Relations Act ("LMRA").  (*See* MTC at 1 (citing 29 U.S.C. § 185).)

14   Northshore's only argument in its briefing against confirmation is that the petition is

15   moot and thus, there is no present, live controversy before the court.  (MTC Resp. at 1;

16   MSJ at 1, 14-16.)  The court disagrees with Northshore.  The court first discusses the

17   justiciability issue before addressing the merits of confirmation.

18   **A.    Justiciability**

19       The judicial power of the federal courts is limited to "cases" and "controversies."

20   U.S. Const., Art. III, § 2.  A federal court's "role is neither to issue advisory opinions nor

21   to declare rights in hypothetical cases, but to adjudicate live cases or controversies

22   consistent with the powers granted the judiciary in Article III of the Constitution."

1   *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en

2   banc).  "[A]n actual controversy must exist at all stages of the litigation." *Biodiversity*

3   *Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002).  "When a controversy no

4   longer exists, the case is moot." *Id.*

5          Parties understandably devote much of their briefing to the open question of

6   whether a motion to confirm an arbitration award requires an active dispute over

7   compliance.  (*See* MTC at 1-3; MTC Resp. at 8-16; MSJ at 12-16; MSJ Resp. at 4-9.)

8   There is presently a circuit split on the issue.  *Compare Teamsters Local 177 v. Un.*

9   *Parcel Serv.*, 966 F.3d 245, 248 (3d Cir. 2020) (recognizing authority to confirm even in

10  absence of active dispute), *and Nat'l Football League Players Ass'n v. Nat'l Football*

11  *League Mgmt. Council*, No. 08-cv-3658, 2009 WL 855946, at *3-4 (S.D.N.Y. Mar. 26,

12  2009) ("The law in the Second Circuit is that § 301 may be invoked to confirm labor

13  arbitration awards regardless of whether the parties have complied with the award."),

14  *with Derwin v. Gen. Dynamics Corp.*, 719 F.2d 484, 491 (1st Cir. 1983) (declining to

15  "put its imprimatur upon an arbitral award in a vacuum").  Before *Teamsters Local*, some

16  district courts had adopted *Derwin*'s rationale.  *See, e.g.*, *Univ. of Chicago Med. Ctr. v.*

17  *Nat'l Nurses Un.*, No. 17 C 2005, 2018 WL 461231, at *4 (N.D. Ill. Jan. 18, 2018).

18         The Ninth Circuit has not considered the issue.  The only Ninth Circuit precedent

19  presented by parties involved a district court's handling of a commercial arbitration

20  award, which is governed directly by the Federal Arbitration Act ("FAA").  *See Collins v.*

21  *D.R. Horton, Inc.*, 361 F. Supp. 2d 1085, 1087 (D. Ariz. 2005) ("The mere fact that [the

22  Defendant] has satisfied . . . its obligation under the arbitration award does not divest the

1  court of authority to confirm . . . the award."); (*see* MTC Reply at 1.)  The parties are

2  further at odds about whether the FAA confirmation analysis carries the same weight

3  over labor arbitration awards.  (MTC Resp. at 10-12; MTC Reply at 1-2.)

4        The court need not determine whether an award can be confirmed without a

5  dispute because here, there is plainly a live dispute over whether Northshore is complying

6  with the Directive.  As such, this case is analogous to *Unite Here Local 1 v. Hyatt Corp.*,

7  862 F.3d 588 (7th Cir. 2017).  In *Unite Here*, the union secured two arbitration awards

8  that directed Hyatt to assign certain tasks to union members rather than supervisors.  *Id.*

9  at 591-93.  The union filed suit under § 301 of the LMRA to confirm these two awards,

10  alleging that Hyatt "has failed and refused and continues to fail and refuse to comply"

11  with the awards.  *Id.* at 593.  Hyatt argued, as Northshore does here, that there was no

12  Article III case or controversy because it accepted and complied with the awards.

13  Therefore, Hyatt contended, confirmation would "accomplish nothing . . . [as] the union

14  is not asking for anything that Hyatt has not already given it."  *Id.* at 598.

15        The Seventh Circuit rejected Hyatt's argument for two reasons, the first grounded

16  in law and the second in fact.  *Id.* at 598-99.  First, the court observed that although Hyatt

17  has accepted the awards, "that does not mean that confirmation . . . can provide nothing

18  of value to the union."  *Id.* at 598.  Confirmation "renders the awards judicially

19  enforceable" and thus "gives teeth to these awards by exposing Hyatt to the prospect of

20  contempt sanctions if it does not comply."  *Id.*  Because a case only becomes moot when

21  there is "no longer any effective relief that the court can order," there remained a live

22  controversy.  *Id.*  Second, the court observed that "although Hyatt purports to accept the

1    awards," there remained a dispute over Hyatt's compliance.  *Id.* at 599.  The court

2    pointed to numerous pending arbitrations as evidence that "the parties remain at odds as

3    to . . . whether Hyatt is complying."  *Id.*

4         Both considerations are true here.  First, confirmation provides Plaintiffs the same

5    benefit as it did for the union in *Unite Here*:  converting the Directive into a judicially

6    enforceable judgment of the court.  *See id.* at 598.  Without confirmation, Plaintiffs

7    would similarly have no remedy in litigation if Northshore ignores the Directive because

8    there would be no option of seeking contempt sanctions.  *See id.* at 599.  Thus,

9    confirmation remains effective relief that this court can order.

10        Additionally, and most importantly, as in *Unite Here*, the record contains ample

11   evidence of a live dispute over compliance.  Parties do not dispute the underlying facts of

12   Northshore's actions but disagree fervently on whether those actions constitute

13   compliance.  Northshore maintains that having their employees sign up as "financial

14   core" members and paying the applicable wages and representation fees suffices as

15   assignment of the Work to Local 66.  (MSJ at 7-8.)  It offers certified payroll documents

16   where workers were deemed "sheet metal workers" and the declaration testimony of Mr.

17   Brian Elbert, one of Northshore's owners, who asserts that those sheet metal workers

18   were paid the wages and benefits owed to Local 66 members.  (11/1/19 Elbert Decl.

19   ¶¶ 4-8, Exs. 9-10.)  But Plaintiffs maintain that such actions are insufficient for

20   compliance, as the essence of the Directive's core requirement—who is doing the

21   Work—remains unfulfilled.  (MSJ Resp. at 5-9.)  They point to Arbitrator Gaba's

22   findings to show that Northshore was "simply calling" the same employees "sheet metal

workers." (Gaba Award at 40.)  Moreover, Plaintiffs argue that "financial core" members are not members as applied to the Directive, noting that the PLA intended representation fees to be paid by non-members in order to stay on a job.  (MSJ Resp. at 7-9; 11/23/20 McCracken Decl. ¶ 5, Ex. 4 at 2.)  Thus, despite Northshore's numerous assertions that there is "no dispute or controversy that Northshore has adhered to [the Directive]," (MSJ at 1), the record and briefing before the court say otherwise.

That there is an active dispute is only buttressed by the many grievances and charges filed by both parties, several of which are still currently pending.  Aside from the grievance before Arbitrator Gaba, there have been five other disputes over the assignment of metal work before various arbitrators and the NLRB.  (11/30/20 McCracken Decl. ¶ 2; 11/23/20 Hilgenfeld Decl. ¶ 2, Ex. 1.)  Three are still pending, and another has recently been remitted to the jurisdictional dispute process for another arbitration hearing.[5] (11/30/20 McCracken Decl. ¶ 2.)  Several decision-makers in these proceedings observed the ongoing nature of the dispute between parties.  (*See, e.g.*, NLRB Decision at 1-2 (noting in August 2020 decision that underlying disputes over work assignment date back to early 2019).)  Thus, as in *Unite Here*, the court finds "the existence of the additional disputes demonstrates that the parties remain at odds as to . . . whether [Northshore] is complying with the [Directive]."  *See* 862 F.3d at 599.

//

//

---

[5] The court recognizes that not all these pending disputes concern the E-130 Project.  (*See* 11/30/20 McCracken Decl. ¶ 2.)  However, the disputes all involve the same core disagreement: whether Northshore can and has assigned sheet metal work to Local 66 members.  (*See id.*)

1    The court emphasizes that it is not commenting on whether Northshore is in fact

2  complying with the Directive.  Indeed, Plaintiffs do not ask it to.  (MTC Reply at 3

3  (recognizing controversy over compliance "does not need to be . . . and should not be

4  resolved[] as a prelude to confirmation")).  At oral argument, Plaintiffs again emphasized

5  that they are not seeking a ruling on compliance and that confirmation would resolve the

6  case.  The only question the court needs to answer for purposes of its jurisdiction is

7  whether there is a live case or controversy, and the court concludes that there is.[6]

8    The ongoing dispute over Northshore's compliance distinguishes this case from

9  others that Northshore relies upon.  The court previously found that this case is

10  distinguishable from *Derwin* but acknowledged that "[i]f Northshore proves that it is

11  already in compliance with the Directive, then this case would be more analogous to

12  *Derwin*."  (Order on MTD at 8-10.)  As articulated above, the record before the court

13  only confirms the existence of an active dispute over compliance.  Thus, the court

14  reiterates what it previously concluded:  Unlike *Derwin* and the other district court cases

15  Northshore presents, in which the party seeking confirmation did not allege

16  non-compliance, this case features both allegations and evidence of an ongoing dispute

17  //

18  _____

19    [6] Because the court is not determining compliance, it has no occasion to comment on
    Northshore's argument that interpreting "financial core" members as Local 66 requests would
20  constitute unlawful discrimination.  (*See* MSJ at 12-13.)  Indeed, this question presents another
    issue of first impression, as parties agreed during oral argument that there was no other factually
    similar case where the definition of "financial core" status impacted compliance with a
21  jurisdictional dispute.  Nor can the court comment on Northshore's concern that Local 66 will
    use the confirmed Directive "to include other Puget Sound Link Light Rail projects" (MSJ at
    13-14) or "to punish sheet metal workers" (MSJ Reply at 12).  However, the court agrees with
22  Northshore that the confirmation of this Directive is confined only to the E-130 Project.

ORDER - 14

1  over compliance.[7]  *See, e.g.*, *Derwin*, 719 F.2d at 490 (observing that union "d[id] not

2  allege that the company ha[d] repudiated or violated the award"); *2199 Seiu Un.*

3  *Healthcare Workers E. v. Civista Med. Ctr., Inc.*, No. KDC10-0479, 2011 WL 310486, at

4  *1 (D. Md. Jan. 28, 2011) (analyzing justiciability when union did not argue

5  non-compliance).

6        Northshore contends that if there were any live case or controversy, those live

7  claims were resolved, and thus mooted, by Arbitrator Gaba and Arbitrator Ahearn's

8  awards.  (MSJ at 14-16.)  The court disagrees.  As Northshore itself repeatedly

9  emphasized during oral arguments, neither Arbitrator Gaba nor Arbitrator Ahearn

10  analyzed compliance with the Directive.  Arbitrator Gaba looked at the hiring practices

11  set out by § 6.1 of the PLA and as such, his decision concerned whether Northshore had

12  to "use the dispatch resources or procedures of [Local 66]."  (Gaba Award at 3.)  He did

13  not touch on whether the dispatched individuals were the correct individuals in

14  accordance with the Directive.  (*See generally id.*)  In short, while Arbitrator Gaba may

15  have answered how the workers should be assigned to the E-130 Project, he had no

16

17        [7] This factual difference is enough to distinguish this case from *Derwin*.  However, the
18  court finds the distinguishing factors identified by *Unite Here* to also be persuasive.  *See* 862
    F.3d at 603-06.  There, Hyatt challenged confirmation based on the "prudential concerns" raised
19  by *Derwin*.  *Id.* at 603.  But the Seventh Circuit pointed out some "significant differences."  *Id.*
    at 604.  First, the two awards at issue offered prospective "cease and desist" relief that the *Derwin*
20  award did not, and thus, confirmation served to reinforce the scope of relief rather than *Derwin*'s
    concern of broadening the awards.  *Id.* at 604-05.  Second, there was no evidence that the union
21  was seeking confirmation to bypass arbitration for future grievances, as was "the evident (if
    unspoken) aim of the union in *Derwin*."  *Id.* at 605.  And third, the Seventh Circuit was not
    convinced that a bifurcated approach of separating confirmation from enforcement amounted to
22  "unwarranted busy work."  *Id.* at 605-06.  The court finds these "significant differences" to
    apply with the same force here.  *See id.* at 604.

1    occasion to determine who those workers should be.  Arbitrator Ahearn was not

2    considering the E-130 Project at all, and as Northshore admits, "[n]o other projects were

3    intended to be encompassed by [the Directive]."  (*See* MSJ at 14; 11/23/20 Hilgenfeld

4    Decl. ¶ 2, Ex. 1. at 2.)  A large portion of the parties' dispute over compliance therefore

5    remains live.

6         Even if Northshore is correct that the arbitration decisions ended any live

7    controversy, there is likely a voluntary cessation issue.  "[A] defendant's voluntary

8    cessation of a challenged practice does not deprive a federal court of [jurisdiction]."

9    *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 189

10   (2000).  The party asserting mootness carries the "heavy burden" of showing that "the

11   challenged conduct cannot reasonably be expected to start up again."  *Id.* at 170.

12   Northshore makes no such showing.  Instead, Northshore simply argues that these cases

13   do not apply because unlike the defendants in those cases who "corrected their behavior

14   after the plaintiffs filed their lawsuit," it "did not start to comply with the [Directive]

15   following commencement of the instant lawsuit."  (MSJ Reply at 6-7.)

16        Northshore's contention contravenes the undisputed record.  Plaintiffs filed this

17   suit on August 9, 2019.  (Pet. at 1.)  Northshore did not have its employees fill out the

18   necessary paperwork and elect to be "financial core" members of Local 66 until August

19   28, 2019.  (Gaba Award at 31; 11/1/19 Elbert Decl. ¶ 9, Ex. 11.)  Northshore's argument

20   for compliance rests in large part on the "financial core" status of its employees.  (*See*

21   MSJ at 12-13.)  Thus, even accepting Northshore's compliance argument as true, it did

22   not begin to comply with the Directive until August 28, 2019—several weeks after

ORDER - 16

1    Plaintiffs filed this suit.  Indeed, Northshore's own argument that Arbitrator Gaba's

2    award for back pay mooted any live claims necessarily rests on the contention that up

3    until August 28, 2019, Northshore had not been complying.  (*See* MSJ at 12-13; Gaba

4    Award at 47.)

5        Because the court finds that there is an active dispute over Northshore's

6    compliance with the Directive, the court declines to dismiss the case and denies

7    Northshore's motion for summary judgment.  Having found a live case or controversy,

8    the court now turns to the issue of confirmation.

9    **B.    Confirmation**

10       An arbitration award must be confirmed unless it is vacated, modified or

11   corrected.  *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008).  An

12   action to vacate an arbitration award under LMRA § 301 must be brought within 90 days.

13   *Un. Ass'n of Plumbers and Steamfitters Local 44 v. Irwin-Yaeger, Inc.*,

14   No. C13-0091TOR, 2013 WL 3350851, at *5 (E.D. Wash. July 3, 2013).  Failure to file

15   an action to vacate within this period "bars [that] party from asserting affirmative

16   defenses in a subsequent proceeding to confirm the award."  *Bhd. of Teamsters and Auto*

17   *Truck Drivers Local No. 70 of Alameda Cty. v. Celotex Corp.*, 708 F.2d 488, 490 (9th Cir.

18   1983) (citing *Sheet Metal Workers Int'l Ass'n, Local 252 v. Standard Sheet Metal, Inc.*,

19   699 F.2d 481, 483 (9th Cir. 1983)).

20       For the first time in oral argument, Northshore argued that Plaintiffs have waived

21   its right to confirmation because the Plan only allows for enforcement.  "It is

22   inappropriate to present a new argument at oral argument and deny the [c]ourt and

1    opposing counsel a chance to review the merits of such an argument." *Value Home*

2    *Auctions, Inc. v. X-Wire Techs., Inc.*, No. SACV 10-0153 AG (RNBx), 2011 WL

3    13225021, at *4 (C.D. Cal. Mar. 23, 2011).  But even if the court were to accept this new

4    argument, it is unavailing.  Although the Plan speaks of enforcement, it does not

5    explicitly bar confirmation or mention it at all.  (*See* Plan at 30.)  As such, the right to

6    confirmation as provided for by the LMRA is not inconsistent with the Plan as to

7    constitute waiver.  (*See id.*); *cf. Gen. Drivers, Warehousemen & Helpers, Local Union*

8    *No. 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963) (ruling that court has authority under

9    § 301 despite absence of word "arbitration" in collective bargaining agreement).

10   Accepting Northshore's argument would remove a significant legal remedy from all

11   signatories of the PLA, and Northshore presents no case or authority adopting such a

12   sweeping interpretation.  The court declines to do so here.

13          The parties agree that they are parties to the PLA, which lays out a procedure for

14   resolution of jurisdictional disputes, as set forth in the Plan.  They further agree that

15   Plaintiffs participated in that procedure, which resulted in the issuance of the Directive.

16   Northshore did not file to vacate the Directive within the 90-day period, nor does it

17   challenge the validity of the Directive now.  (*See* MSJ; MTC Resp.; MSJ Reply.)  Thus,

18   the court finds that Northshore has waived any affirmative defenses that would otherwise

19   be available and grants Plaintiffs' motion to confirm the Directive.

20                          **IV.    CONCLUSION**

21          For the foregoing reasons, the court GRANTS Plaintiffs' motion to confirm (Dkt.

22   # 37) and DENIES Northshore's motion for summary judgment (Dkt. # 34).  The

ORDER - 18

1    Directive of the Plan Administrator of the Plan for the Settlement of Jurisdictional

2    Disputes in the Construction Industry to Defendant Northshore Exteriors, Inc. is hereby

3    CONFIRMED.

4            Dated this 23rd day of December, 2020.

5

6    _____

7    JAMES L. ROBART
     United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 19